**[Cite as *In re K.R.*, 2024-Ohio-4723.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re K.R.                                                    Court of Appeals No.  L-24-1119

                                                             Trial Court No.  JC23292953

                                                             **<u>DECISION AND JUDGMENT</u>**

                                                             Decided:  September 27, 2024

* * * * *

Janna E. Waltz, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal from the May 6, 2024 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, V.R., the father of minor child, K.R., and granting permanent custody of the child to appellee, Lucas County Children Services ("LCCS" or "the agency").  For the reasons that follow, we affirm the judgment.

**{¶ 2}** Father sets forth one assignment of error:

The trial court's finding that father failed repeatedly and continuously to substantially remedy the conditions causing the child to be placed outside the home within a reasonable time or should not be placed with him pursuant to R.C. 2151.414(B)(1)(a) was not supported by clear and convincing evidence when time remained on the case.

## Background

**{¶ 3}** K.R. was born on February 7, 2023, to mother, S.M., and father, who were not married. At the time of K.R.'s birth, both he and mother tested positive for cocaine. K.R. required treatment in the hospital's neo-natal intensive care unit ("NICU") for drug withdrawal symptoms, including tremors, for seven days.

**{¶ 4}** On February 8, 2023, LCCS received a referral which alleged mother tested positive for cocaine and fentanyl on September 2, 2022, while pregnant with K.R., mother had previous involvement with LCCS, and lost custody of two other children.

**{¶ 5}** On February 14, 2023, an ex parte order was issued by the juvenile court directing LCCS to take K.R. into shelter care custody. In the order, LCCS set forth, inter alia, that "[i]n 2021 both parents lost custody of a child. In 2019 Mother lost custody of one other child. Concerns in 2021 include substance use and father's criminal charges. . . . Neither parent completed services in 2021."

**{¶ 6}** Also on February 14, 2023, LCCS filed a complaint in dependency, neglect and abuse and a motion for a shelter care hearing. That same day, a shelter care hearing

2.

was held, and temporary interim custody of K.R. was granted to LCCS. Mother and father were present at the shelter care hearing and agreed with the award of temporary custody of K.R. to LCCS. K.R. was placed in a foster home. A court-appointed special advocate ("CASA") was appointed for K.R.

{¶ 7} On March 8, 2023, the case plan was filed with the following six concerns: (1) mother's mental health; (2) mother's substance abuse during pregnancy, K.R.'s positive drug screen at birth, drug withdrawal and potential developmental delays; 3) mother's overall judgment; (4) father's alcohol and marijuana use; (5) father's domestic violence ("DV") history and multiple guns and weapons charges; and (6) father's loss of custody of another child due to DV and substances abuse.

{¶ 8} On April 17, 2023, the CASA filed a report and recommendation which included the following information. When K.R. was born he weighed 4 pounds, 13 ounces, father was at the hospital and signed the affidavit of paternity. According to pediatric records, K.R. had slow weight gain and slow eating. During visits with father, K.R. appeared comfortable, made facial expressions and cooed as father spoke to him. Father fed K.R. properly, held him while burping him, and appeared to show love and affection. Father attended every visit with K.R. and brought a diaper bag filled with supplies to the visits. Father was able to spend an extra hour with K.R. when mother did not show up for her visits. Father reached out to the CASA to schedule a home visit, and at his home, everything appeared in order, the house had a clean appearance, and a room was set up for K.R. with baby items. Father expressed a desire to be reunified with K.R.

3.

**{¶ 9}** On April 24, 2023, the adjudication and disposition hearing was held; father was present for a portion of the hearing. The magistrate, in her decision, found K.R. dependent, neglected and abused, and that it was in K.R.'s best interest for LCCS to have temporary custody. On May 9, 2023, the court adopted the magistrate's decision.

**{¶ 10}** On June 2, 2023, an updated case plan was filed, which removed mother due to her lack of contact and engagement, and set forth four concerns: (1) father's alcohol and marijuana use; (2) father's DV history and multiple guns and weapons charges; (3) K.R.'s positive drug screen at birth, drug withdrawal and potential developmental delays; and (4) father's loss of custody of another child due to DV and substances abuse.

**{¶ 11}** On August 15, 2023, a case plan review hearing was held; father attended. The magistrate's decision indicated the following evidence was presented: mother was not involved in the case and did not visit K.R.; father completed a dual assessment, was engaged in parenting classes and DV classes, worked with Help Me Grow and visited K.R. at Level 2; and K.R. was engaged in Help Me Grow and speech therapy and was doing very well. On September 5, 2023, the court adopted the magistrate's decision.

**{¶ 12}** On November 8, 2023, LCCS filed a motion to, inter alia, change placement and terminate temporary custody. LCCS requested that legal custody of K.R. be awarded to father, with protective supervision to LCCS for six months. Also on that day, a statement of understanding for legal custody, signed by father, was filed.

4.

{¶ 13} On December 11, 2023, LCCS filed a motion to dismiss its previous motion due to a change in the case. The court granted LCCS's motion to dismiss.

{¶ 14} On December 14, 2023, LCCS filed its motion for permanent custody of K.R. on the bases of R.C. 2151.414(B)(1)(a) and (b), and R.C. 2151.413(E)(1), (2), (4), (10) and (11). The facts in support of the motion included: mother failed to make herself available to be assessed for case plan services and had no contact with K.R.; father had five positive alcohol screens; father had a DV incident on September 23, 2023, with mother, and he was charged with DV and assault; and father was arrested on outstanding warrants on November 11, 2023, after police were called to father's home for a DV dispute.

{¶ 15} On April 19, 2024, the trial on LCCS's motion was held; father attended.

{¶ 16} On May 6, 2024, the juvenile court issued its judgment granting permanent custody of K.R. to LCCS. Father appealed. Mother did not appeal and is not a party to this appeal. Thus, we will only mention mother when pertinent to father's appeal.

### Permanent Custody Law

{¶ 17} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) the child's best interest is served by granting permanent custody to the agency. *In re A.H.*, 2011-Ohio-4857, ¶ 12 (6th Dist.). Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts

5.

a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161

Ohio St. 469 (1954), paragraph three of the syllabus.

**First Prong**

{¶ 18} This prong requires a finding by the juvenile court, by clear and convincing

evidence, that any of the factors under R.C. 2151.414(B)(1)(a) through (e) applies. The

court need only find that one factor exists. *See In re C.W.*, 2004-Ohio-6411, ¶ 21. *See*

*also In re D.P.*, 2011-Ohio-4138, ¶ 52 (6th Dist.).

Here, as to father, the court found R.C. 2151.414(B)(1)(a) applied, which states:

> [T]he court may grant permanent custody of a child to a movant if the court
> determines . . . by clear and convincing evidence, that it is in the best
> interest of the child to grant permanent custody . . . to the agency . . . that
> any of the following apply:
> (a) The child is not abandoned or orphaned, has not been in the temporary
> custody of one or more public children services agencies . . . for [12] or
> more months of a consecutive [22]-month period . . . , and the child cannot
> be placed with either of the child's parents within a reasonable time or
> should not be placed with the child's parents.

{¶ 19} R.C. 2151.414(E) sets forth the elements necessary to satisfy a

determination under R.C. 2151.414(B)(1)(a), that the child cannot or should not be placed

with either parent within a reasonable time. *See In re Schaefer*, 2006-Ohio-5513, 857

N.E.2d 532, ¶ 38. Here, as to father, the juvenile court found that R.C. 2151.414(E)(1),

(2), (4) and (11) applied, which provisions state:

> (1) Following the placement of the child outside the child's home and
> notwithstanding reasonable case planning and diligent efforts by the agency
> to assist the parents to remedy the problems that initially caused the child to
> be placed outside the home, the parent has failed continuously and
> repeatedly to substantially remedy the conditions causing the child to be
> placed outside the child's home. In determining whether the parents have

6.

substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic . . . chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section[;]

. . .

(4) The parent has demonstrated a lack of commitment toward the child by . . . actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child . . . and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

**Second Prong**

{¶ 20} This prong concerns the best interest of the child, and when the juvenile court is making this determination, R.C. 2151.414(D)(1) provides that all factors which are relevant shall be considered by the court, including, but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed . . . through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child[;]

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 21} The following is a summary of the testimony offered by the witnesses at trial.

**Caseworker English**

{¶ 22} Andrew English testified to the following. He was an ongoing caseworker for LCCS, assigned to K.R.'s family in March 2023. Mother had two other children and lost custody of them due to substance abuse and DV concerns. All three of mother's children tested positive for cocaine at birth. Father is the biological father of mother's second child, K.R.'s full sibling, and third child, K.R. Mother and father had criminal histories.

<u>Custody Case for K.R.'s Full Sibling</u>

{¶ 23} In that case, concerns with father were DV, parenting and alcohol abuse. Case plan services offered to both parents included parenting classes, DV classes, completing a dual assessment, and attending the child's medical appointments. Mother completed no services. Father completed a dual assessment four times as LCCS re-referred him due to alcohol concerns. With the first two assessments, there were no recommendation for services; with the third assessment, father was diagnosed with alcohol use disorder and NIOP (non-intensive outpatient) was recommended but father did not engage; and with the fourth assessment, father was again diagnosed with alcohol use disorder and IOP (intensive outpatient) was recommended, which father started but did not finish. LCCS was granted permanent custody of K.R.'s full sibling in 2020.

8.

Father's 12-year-old Daughter

{¶ 24} Father has a 12-year-old daughter with another woman ("mom"), and he has legal custody of the daughter. There was a shared parenting arrangement where the daughter split her time between her mom and father. The daughter stayed with father during the week, then went with her mom on weekends and in the summer. There was no agency involvement regarding the daughter, despite DV reports, as the reports were screened out because the daughter was not present when those incidents occurred.

{¶ 25} LCCS allowed the daughter to stay with father even though K.R.'s full sibling was removed because the daughter attended school regularly and after "speaking and interviewing her, there did not seem to be a threat or a concern for her initial safety." English believed "that she has protective capacities given her age and her split time, as well as exposure to mandatory reporters."

K.R.'s Case

{¶ 26} Regarding LCCS's involvement with K.R., a referral was received in February 2023, because mother tested positive for fentanyl during her pregnancy and K.R. was born positive for cocaine. While K.R. was in NICU with withdrawal symptoms including tremors, father visited and smelled of alcohol.

{¶ 27} LCCS filed a complaint, received temporary custody of K.R., and a case plan was established, with a goal of reunification. The case plan services for father included a dual assessment, parenting and DV services. Father completed one assessment and no services were recommended. Thereafter, English paid an

9.

unannounced visit at father's home and father appeared heavily intoxicated. Father also had positive screens for alcohol and THC (marijuana), and there was a report that father smelled of alcohol when he visited K.R. at the agency. English re-referred father for an assessment, and included the foregoing information, but no services were recommended as father was screened for other substances, not alcohol. Father disagreed with the re-referral saying he "only had a few drinks on the weekend and it was not a problem for him."

*Father's Drinking*

{¶ 28} LCCS routinely requested screens of father and, with a few exceptions, father complied, with the following results: February 2023, positive for ETG (alcohol) and THC; March 2023, positive for ETG and THC; April 2023, negative; May 2023 (2 screens), negative; June 21, 2023, positive for ETG and THC; July 2023, positive for ETG; August 2023, positive for ETG, THC; and September 2023, negative.

{¶ 29} At two home visits, English observed that father appeared intoxicated and smelled of alcohol, and at one visit, father's daughter came home from school. English recalled father "stumbled up the stairs . . . he was slurring his words. He had difficulty . . . finding the correct key to his apartment, and then once obtained[, he had] difficulty putting the key in the key hole to unlock it." Father said he had two drinks earlier that day.

{¶ 30} English routinely discussed father's alcohol use with him. Father said he smelled of alcohol due to his social drinking on weekends, when his daughter was not

10.

present. Father also said he went to a downstairs neighbor's place and drank. Father insisted drinking was legal and it was culturally acceptable for adults to regularly drink. Father minimized his drinking saying he was socially drinking on his mother's birthday, the Super Bowl or some other event. English believed father's alcohol use affected his ability to parent and protect K.R. due to the child's young age.

*Father's Case Plan Services*

**{¶ 31}** Father attended and completed both parenting classes and DV classes. He had stable housing (a one-bedroom apartment), but he did not have a stable job which was a concern as he needed a source of income to be able to provide for himself and his family. Father was referred to Ohio Means Jobs or JFS (Job and Family Services), with which he had previously been linked.

*K.R.'s Case Plan Services and Medical Appointments*

**{¶ 32}** K.R. had services through Help Me Grow and Early Intervention due to being born positive for cocaine and having to withdraw from the drug. K.R. had issues with swallowing, being underweight and frequently being sick. Help Me Grow worked with K.R., and during visits at the agency at the end of the summer of 2023, father was present. K.R. also had feeding therapy, speech and occupational therapy, and other ongoing medical needs for which he saw a pulmonologist and gastrointestinal doctor. In the summer of 2023, K.R. was in the hospital for three days for breathing problems and received breathing treatments. K.R. was slightly behind developmentally with his gross motor skills and his ability to take in enough nutrients.

11.

{¶ 33} Father was not initially given the dates of K.R.'s medical visits due to concerns that father was in the NICU smelling of alcohol, but after father had clean screens in late spring, early summer of 2023, father was given the dates and encouraged to attend. In September 2023, English transported father to two of K.R.'s doctor appointments. After that, father did not attend any other medical appointments for K.R. despite having the dates and a bus pass to assist with transportation.

*Visits/Reunification*

{¶ 34} Father visited with K.R. consistently throughout the case. Visits began at Level 1, which were held at the agency and a supervisor was always in the room with father and K.R. English was told that father smelled of alcohol and nodded off during visits, so this issue was addressed with father and was alleviated. Father progressed to Level 2 visits, which were held at the agency in a private room monitored by agency visitation staff.

{¶ 35} By the middle of October 2023, father had 90 to 100 days clean and made progress with his case plan services so English recommended that father have unsupervised Level 3 visits with K.R., with the goal of soon reunification. Shortly thereafter, however, LCCS was made aware of a positive urine screen and DV reports involving father. Due to the continued concerns, father's visits were not moved to Level 3.

{¶ 36} English transferred the case to Caseworker Eades at the end of October 2023.

12.

**Caseworker Eades**

{¶ 37} Rachel Eades testified she was an ongoing caseworker for LCCS, assigned to K.R.'s family in October 2023, following Caseworker English. She had had zero contact with mother but had regular contact with father.

Father's Alcohol Use

{¶ 38} Eades requested that father provide urine screens, with which he complied four out of seven times; all four of those screens were positive for alcohol. The first screen was in November 2023, and the last screen was March 13, 2024.

{¶ 39} Eades discussed with father the agency's concerns for his continued alcohol use, that K.R. would not be safe in father's home as K.R. was an infant who had significant needs, was not verbal and required an adult to provide for all of his basic needs. If father were under the influence when caring for K.R., father could potentially accidentally harm the child, or the child may not have his needs met. Father stated that he just drank on the weekend, and he did not have a problem. Father did not indicate that he would abstain from alcohol use, but in March 2024, he said he was going to start AA meetings.

DV

{¶ 40} Father completed his DV services after Eades received the case. Eades reached out to the DV services provider in mid to late November 2023, at which time father had completed 24 of the 26 classes; he later completed the two remaining classes.

13.

Eades also notified the provider about some concerns for DV that the agency had received.

{¶ 41} Eades learned from the CASA, when they were working together to schedule Level 3 visits, that father was in booking at the jail. A police report indicated that in September 2023, father and mother got into an altercation and father punched mother in the face and ribs, and on November 11, 2023, police were called out for a domestic dispute between father and mother, and police were told the two were drinking, got into a verbal altercation and there were no issues, father did not want any issues because he had an open CSB case. It was noted that father had scratches on his face and neck and mother had blood on her hands and pants. During the latter domestic dispute, police found that father had a warrant for the September DV incident, so he was arrested. Father ultimately pled no contest to negligent assault, amended from DV, and was sentenced to, inter alia, 60 days in jail with 45 days suspended and no contact with mother, the victim. Mother did not appear for the hearing on father's charges.

{¶ 42} At the time of the permanent custody trial in April 2024, there was a no-contact order in place between father and mother, and in March 2024, father told Eades he was not having any contact with mother. Yet, Eades found a crime report from February 2024, which stated father and mother had an argument and father hit mother. Eades was concerned that father and mother continued to have contact because mother did nothing to rectify LCCS's concerns, and had K.R. been in father's home, he could have been hurt.

14.

**{¶ 43}** Eades noted the September 2023 DV incident occurred in the middle of father's DV classes, and the other two incidents happened after he completed his DV services, so it appeared he was not able to utilize skills that he learned to refrain from these types of situations. Eades also observed it did not matter whether father was the victim or the aggressor in the situations, the concern was the company he kept.

**{¶ 44}** Father did not tell Eades about any of the DV incidents, which was a concern, because by not talking about what happened, it appeared he and mother were having potentially more contact, and if someone was having an issue with a former or current partner, LCCS would want to be aware so a plan could be developed.

**{¶ 45}** Eades also knew that father and mother had a DV history prior to K.R.'s case, and father had DV issues with someone else.

K.R. and Case Plan Services

**{¶ 46}** K.R. was in the same foster home and continued with Early Intervention, feeding, occupational and speech therapies, as well as a pulmonologist and a gastroenterologist. K.R. was only in the third percentile for weight and height, he weighed about 16 pounds even though he was over one year old, and he wore six-to-nine-month clothing. K.R. continued to have breathing problems and was on medication. Father did not attend K.R.'s medical appointments but had reached out to the foster parent for those dates.

{¶ 47} K.R. ate baby food and table foods, and was walking and running, but there were still concerns with his communication, as he babbled, but had not made much progress.

Visits

{¶ 48} Father visited K.R. consistently, at Level 2, and there were no concerns.

Father's 12-year-old Daughter

{¶ 49} Eades was aware that father had custody of his daughter, there was no open case for the daughter and LCCS was not seeking permanent custody of the daughter. This was because the daughter was of an age where she had protective capacities that an infant did not have, she went back and forth between father and her mom, and she went to school where there were mandated reporters.

Search for Relative Placement

{¶ 50} Eades asked father for names of relatives for potential placements, and she conducted searches through which she identified a handful of people. Eades sent out about nine or ten letters but received no responses. At father's request, Eades contacted his mother, but she was not able to take placement or be assessed for placement because she cared for her daughter who recently had a stroke.

Agency Request

{¶ 51} LCCS requested permanent custody of K.R., as it was in his best interest, due to concerns for DV incidents and continued contact between the parents and father's alcohol use. Eades noted the concerns that brought this case to LCCS's attention are the

16.

same concerns that exist today. Mother participated in no case plan services, she did not visit K.R., Eades did not believe that father was able to meet K.R.'s needs, and it would not be safe to place K.R. in the home with the parents. To Eades' knowledge, the foster parents were willing to adopt K.R. if permanent custody was granted.

**CASA**

{¶ 52} Bea Garces, the CASA, testified that she was appointed in March 2023, and had no contact with mother, but contact with father was consistent. The CASA never saw father intoxicated during home visits or suspected it during phone calls. She discussed case plan services with him, and he appeared to understand what was being asked of him.

{¶ 53} The CASA visited K.R. monthly and he was a happy baby, although at 14 months, he was nonverbal, had some developmental delays and was small for his age. At the foster home, K.R. was engaged with the foster mother and looked comfortable in the household, despite some commotion associated with other children. K.R. appeared to be bonded to the foster mother and the other children in the home.

{¶ 54} Father visited regularly with K.R. and took over mother's time slot when she stopped visiting. Father and K.R. seemed happy around each other, father was very present, not distracted, and K.R. seemed to be aware of who father was.

{¶ 55} Father stayed very engaged with the CASA throughout the case, kept her updated on when he was seeing K.R. and how he felt about the case, so she was shocked when the DV calls came in between him and mother in September and November 2023,

17.

and then again in February of 2024. Father never reached out to the CASA to let her know that he was having these issues, even though she felt they had a pretty strong relationship with one another in terms of K.R.'s best interest.

{¶ 56} The CASA had concerns with father's ability to parent K.R. due to the DV issues between father and mother, which were in the past, yet still happening, "which is kind of, . . . why we're in the situation we are today." The CASA was also aware of mother's criminal past and substance abuse past and was concerned with mother coming over to father's home unexpectedly and father not handling the situation correctly, not calling the police and not knowing that mother may be a direct or emotional threat to the child. It did not seem like father would know what to do to keep K.R. safe.

{¶ 57} The CASA was asked if there was any indication that father's daughter was ever assaulted by mother or in direct contact in a physical way with mother, and the CASA said that according to father, the daughter was not in the house during the altercations with mother. The CASA acknowledged that father had been able to protect his daughter.

{¶ 58} The CASA was also somewhat concerned about father's positive alcohol screens since he may not just drink on the weekends, which was usually the reason he gave for positive screens. She noted the caseworkers were concerned because they saw father intoxicated in some way or the other.

{¶ 59} The CASA recommended custody of K.R. to LCCS because she did not believe that father was adequately equipped to handle such a young child, especially with

18.

so many developmental delays, nor could father properly defend K.R. from harm. The CASA also did not feel that father could economically care for K.R., take K.R. to his appointments and make sure that K.R. received all of the care that he needed. The CASA recognized there were financial and transportation services available for people who had economic situations.

## Juvenile Court's Judgment

{¶ 60} In its judgment, the juvenile court noted that in 2018, a case was filed with respect to a half-sibling of K.R., due to mother's substance use, parenting and housing. Mother failed to complete case plan services. Permanent custody of the half-sibling was awarded to LCCS on October 22, 2018.

{¶ 61} Then, in 2019, a case was filed regarding a full sibling of K.R., and the issues included mother and father's substance use and DV. Both parents were offered case plan services but failed to complete those services. On September 28, 2020, permanent custody of the sibling was awarded to LCCS.

{¶ 62} In 2023, LCCS became involved with the family again when K.R. was born. Case plan services were offered yet again, and father completed some services, but he failed to make behavioral changes. LCCS filed a motion for permanent custody of K.R. The juvenile court's findings and conclusions as to LCCS's motion, relevant to father, follow.

19.

**First Prong of Permanent Custody Analysis**

{¶ 63} The court found, by clear and convincing evidence that R.C. 2151.414(B)(1)(a) applied, that K.R. cannot or should not be placed with father within a reasonable time. The court relied on R.C. 2151.414(E)(1), (2), (4) and (11).

{¶ 64} The court found, under R.C. 2151.414(E)(1), that following K.R.'s placement outside of the home and notwithstanding reasonable case planning and diligent efforts by LCCS to assist father to remedy the problems that caused K.R. to be placed outside the home, father failed continuously and repeated to substantially remedy those problems. Father engaged in and completed many of his case plan services but tested positive for alcohol and continued to exhibit a pattern of domestically violent behavior with mother despite completing DV services.

{¶ 65} The court also found, under R.C. 2151.414(E)(2), that father suffered from such severe chemical dependency that he was unable to provide an adequate permanent home for K.R. at the present time, and the court found it was highly unlikely that father would remedy his dependency within one year from the trial date. Father had a long history of alcohol use, which was a concern in this case and his prior case. Caseworker English testified that father had a prior alcohol use disorder and failed to complete any services to remedy it. Father did two dual diagnostic assessments with no recommendations but there were concerns he was intoxicated while visiting K.R. at a home visit and father continued to test positive for alcohol regularly. Caseworker Eades testified that she addressed father's alcohol use with him, and he acknowledged the

20.

concern but did not indicate he would refrain from use. Eades testified that father said he was beginning to participate in AA meetings in March 2024.

{¶ 66} The court found, pursuant to R.C. 2151.414(E)(4), that father demonstrated a lack of commitment toward K.R. by showing an unwillingness to provide an adequate permanent home by not refraining from alcohol use even though he recognized it was a concern throughout the case, and he also continued to engage with mother which resulted in at least three police reports for DV despite completing DV services.

{¶ 67} Lastly, the court found, pursuant to R.C. 2151.414(E)(11), that father had his parental rights involuntarily terminated with respect to K.R.'s full sibling, and father failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, he can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of K.R. The concerns in the prior case mirrored the concerns today. Father was offered case plans services in the prior case and failed to complete those services. Father was offered case plan services in this case and engaged and completed many of the services, but he failed to demonstrate that he is able to make the changes necessary to provide a safe, stable, and permanent home for K.R.

**Second Prong of Permanent Custody Analysis**

{¶ 68} As to K.R.'s best interest, the court considered the relevant factors in R.C. 2151.414(D)(1)(a) through (e) in reaching its determination.

{¶ 69} Regarding (D)(1)(a), the court considered K.R.'s interactions and relationships with father and others and found K.R. had been in foster care since his

21.

release from the hospital, and was doing very well in his placement, according to the CASA. K.R. was well-bonded to the foster parents and to father. The foster parents met all of K.R.'s needs, including his numerous medical needs, and they updated father as to K.R.'s progress. The foster parents were willing to adopt K.R.

{¶ 70} As to (D)(1)(b), the court considered that K.R. was 14 months old, too young to understand the concept of permanency, and not yet verbal but seemed aware of his surroundings. The CASA testified K.R. appeared happy in his placement and bonded to the caregivers.

{¶ 71} As to (D)(1)(c), the court considered K.R.'s custodial history, and that he was in substitute care his entire life.

{¶ 72} Regarding (D)(1)(d), the court considered K.R.'s need for a legally secure permanent placement. Despite intensive efforts, no appropriate relatives were identified for placement, so a legally secure, permanent placement could not be achieved without a grant of permanent custody.

{¶ 73} With respect to (D)(1)(e), the court found that none of the factors in R.C. 2151.414 (E)(7) to (11) applied.

**Conclusion**

{¶ 74} The juvenile court concluded that LCCS presented clear and convincing evidence that demonstrated K.R. cannot and should not be placed with father within a reasonable period of time, and that a grant of permanent custody was in K.R.'s best interest.

22.

## Assignment of Error

**Father's Arguments**

{¶ 75} Father argues that LCCS did not prove by clear and convincing evidence that he did not remedy the issue which caused the removal such that K.R. could not or should not be placed with him within a reasonable time.

{¶ 76} Father asserts it is arguably significant that he has a shared parenting plan and substantial contact with his daughter, and LCCS did not remove her during this case or his prior case, in part, because LCCS did not believe she was at risk of harm from him.

{¶ 77} Father contends he engaged in services, visited K.R. and began to develop a bond. He completed two diagnostic assessments, and no services were recommended based on his representation that he only drinks on weekends and when his daughter is not there.

{¶ 78} Father claims that he completed batterer's intervention services and had some clean screens which demonstrate an ability to remain clean and sober, arguably for weeks at a time. Father also has stable housing.

{¶ 79} Father notes that prior to changing caseworkers in October 2023, LCCS filed a motion for reunification, and he was under consideration for a change to Level 3 visits, the least restrictive. Unfortunately, around that time he had positive screens for alcohol and marijuana, so his visits remained at Level 2, and in September 2023, there was a DV incident with father and mother. Father recognizes there were 911 calls in

23.

November 2023 and February 2024, which involved mother and father, but no charges were filed.

{¶ 80} Father maintains, taken together, arguably, he showed improvement in his behaviors, particularly with the sporadic clean screens, and while his propensity towards physical altercations with mother was concerning, the most recent incident did not occur in his daughter's presence.

{¶ 81} Father argues, most significantly, this court should find that time remained on the case as K.R. had been in LCCS's temporary custody for about 14 months at trial time. Father asserts that pursuant to R.C. 2151.414(D)(2)(b), temporary custody may last 24 months, such that time had not run on his ability to demonstrate compliance and stability, and the possibility existed that he would be able to provide care and support for K.R.

{¶ 82} Father contends that given the time remaining on the case and his progress, this court should find the juvenile court's termination of his parental rights pursuant to R.C. 4151.414(E)(1) and (2) was not supported by clear and convincing evidence. Father, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990) and *In re K.C.*, 2021-Ohio-184, ¶ 14 (4th Dist.), submits this court should examine the record to determine whether the juvenile court had sufficient evidence before it.

**LCCS's Arguments**

{¶ 83} LCCS argues the concerns that caused K.R. to be placed outside of the home included substance use, DV, and parenting practices. Father completed dual

24.

assessments, and no services were recommended, yet LCCS continues to have concerns with his substance use because he was observed to be intoxicated at least twice during the case and tested positive for alcohol and/or THC. Father completed DV classes in November 2023, however DV remains a concern as he was part of three DV incidents during this case, two of which took place after he completed DV services. Thus, father failed to show he was able to use the skills from DV classes and put them into practice.

{¶ 84} LCCS asserts it presented ample evidence that K.R. cannot or should not be placed with father within a reasonable time. LCCS argues father failed to remedy the issues that caused K.R. to be placed outside of the home because there are still concerns with father's substance use, he continues to engage with mother resulting in DV reports and charges, he lost permanent custody of K.R.'s sibling in 2020, and did not demonstrate that he made the necessary changes in his behavior to parent K.R.

{¶ 85} LCCS submits the juvenile court's findings were proven by clear and convincing evidence by the witness testimony and supporting exhibits. LCCS maintains the juvenile court had more than sufficient evidence to support a finding that permanent custody was in K.R.'s best interest under R.C. 2151.414(D)(1)(a)-(d), and that R.C. 2151.414(E)(1), (2), (4) and (11) were met by clear and convincing evidence.

**Standard of Review**

{¶ 86} In *In re Z.C.*, 2023-Ohio-4703, ¶ 18, the Supreme Court of Ohio held that "the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate

25.

parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties."

{¶ 87} Here, father claims the juvenile court's judgment was not supported by clear and convincing evidence and that this court should examine the record to determine whether the juvenile court had sufficient evidence before it. LCCS contends that a juvenile court's determination in permanent custody is not to be reversed unless it is against the manifest weight of evidence and the juvenile court had more than sufficient evidence to support a finding that permanent custody is in the best interest of the child.

{¶ 88} Upon review of the arguments of father and LCCS, we find the sufficiency of the evidence standard applies in this case. Sufficiency of the evidence is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*

### Analysis

{¶ 89} The record shows that LCCS commenced this case after K.R. was born with cocaine in his system and experienced withdrawal symptoms, just like his sibling. Despite services offered by LCCS to assist father in remedying the issues which caused K.R.'s placement outside of the home, father failed to make meaningful progress in those services. Father complied with the case plan services to complete dual assessments and DV services, but many of father's screens were positive for alcohol and/or marijuana and he smelled of alcohol and/or was observed to be intoxicated on numerous occasions. The

26.

record shows that prior to this case, in the case involving K.R.'s sibling where LCCS was granted permanent custody, there were concerns about father's alcohol abuse. In that case, father completed four dual assessments, and in the last two assessments, he was diagnosed with alcohol use disorder and outpatient treatments were recommended. Father failed to complete any substance use treatment to remedy his alcohol disorder.

{¶ 90} The evidence shows that father has a long history of alcohol issues, yet he failed to acknowledge that he had a problem with alcohol. Rather, father insisted he was a social drinker and drank on the weekends and on special occasions and not around his daughter.

{¶ 91} In the course of this case, father had ongoing DV issues with mother. While he was taking DV classes, father was in a DV incident, and after he completed his DV services he was involved in two more DV situations, all with mother. In K.R.'s sibling's case, one of the concerns with father and mother was DV, so the case plan services offered to father included DV classes, but he did not complete those classes. The record further shows that prior to the sibling's case, father had a DV history with another person.

{¶ 92} During this case, father's visits with K.R. were consistent and mainly appropriate, and visits progressed from Level 1 to Level 2. However, father was unable to advance to unsupervised Level 3 visits due to positive alcohol screens and DV incidents.

27.

{¶ 93} As to K.R., the record indicates that following his discharge from the hospital, he was placed in a foster home, where he has remained the entirety of this case. K.R. has numerous medical issues, including problems with swallowing, being underweight and being frequently sick. K.R. receives therapies and sees specialists for his ongoing medical needs. K.R. also has developmental delays. All of K.R.'s needs, including his medical needs, are met in his foster placement. While father was not provided with the dates of K.R.'s doctor appointments early in the case due to concerns that father smelled of alcohol which visiting K.R. in the NICU, after father had clean screens, the caseworker gave father the dates of K.R.'s upcoming medical appointments. Father attended only two of K.R.'s doctor's visits, when the caseworker drove him.

{¶ 94} The CASA noted K.R. was happy and bonded with his foster mother, the other children in the foster home and with father. The CASA recommended custody of K.R. to LCCS as she did not believe that father was adequately equipped to handle a young child, especially with so many developmental delays, nor could father properly keep K.R. safe.

{¶ 95} We take note that throughout K.R.'s case and his sibling's case, father had custody of his 12-year-old daughter, which LCCS allowed, because she attended school regularly, there did not seem to be a threat or a concern for her initial safety and she had protective capacities due to her age and her split time/shared custody, and her access to mandatory reporters. We also note, however, that K.R. is an infant with developmental

28.

delays who cannot meet his own needs or protect himself and he has ongoing medical issues, so he requires daily, around the clock care.

{¶ 96} The evidence in the record reveals that father did not complete any substance use treatment to remedy his alcohol disorder and he continued to exhibit a pattern of domestically violent behavior with mother despite completing DV services. Although father argues that time remained on the case, such that time had not run on his ability to demonstrate compliance and stability and that the possibility existed that he would be able to provide necessary care and support for K.R., the record indicates that father was given ample opportunity to prove he could safely and adequately provide for K.R., but the same issues which were present at the start of K.R.'s case (and K.R.'s sibling's case) were present at the time of trial. This lack of progress does not show a commitment and willingness to provide a safe, permanent home, nor does it warrant a grant of additional time for reunification.

{¶ 97} Based upon our thorough review of the record, we find there is sufficient evidence in the record to support the juvenile court's decision that pursuant to R.C. 2151.414(B) (1)(a) and R.C. 2151.414(E)(1), (2), (4) and (11), K.R. cannot and should not be placed with father within a reasonable period of time due to father's persistent, unresolved alcohol and DV issues, and pursuant to R.C.2151.414(D)(1)(a) through (e), an award of permanent custody to the agency is in K.R.'s best interest.

{¶ 98} Accordingly, we find father's sole assignment of error not-well taken.

29.

**{¶ 99}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                                    _____
                                                                                        JUDGE
Myron C. Duhart, J.

                                                                      _____
Charles E. Sulek, P.J.                                                  JUDGE
CONCUR.

                                                                      _____
                                                                                        JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.